### In re TIMES PUB. CO.

#### (District Court, E. D. Pennsylvania. December 9, 1910.)

#### No. 3,364.

BANKRUPTCY (§ 345*)—CORPORATION—RIGHTS OF BONDHOLDERS—ESTOPPEL.

A corporation, which had made an issue of $12,500 of bonds secured by a first mortgage on its real estate, desiring to increase its working capital, executed and recorded a new mortgage securing an issue of $25,000, reciting that it was a first lien on the same property; the intention being to retire the first issue. Certain holders of first bonds delivered them to the managing officer of the corporation, signing a paper in which they agreed to exchange the same "for a like amount in a new issue for $25,000 to be secured in the same manner and conditions as our present bonds." The corporation became bankrupt; the other holders of first bonds not having agreed to an exchange, but some of the new bonds having been sold to other purchasers. The first mortgage had not been released in whole or in part. *Held*, that the assenting holders of first bonds were not estopped by their agreement to claim their rights under the first mortgage as against purchasers of the new bonds, whether or not such purchasers were shown or told of the agreement to exchange, since such agreement was to exchange only for new bonds "secured in the same manner and conditions" as the old bonds, which implied a first lien, and the record was constructive notice that as yet the new mortgage was not a first lien.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 345.*]

In the matter of the Times Publishing Company, bankrupt. On review of decision of referee. Reversed.

William T. Fulton, for first mortgage bondholders.
William F. Beyer, for second mortgage bondholders.

J. B. McPHERSON, District Judge. The Times Publishing Company carried on a printing and publishing business in Oxford, Chester county, Pa., and was adjudged bankrupt in January, 1909. Its real estate was afterwards sold discharged of liens, and the distribu-

tion of this fund gives rise to the present dispute. Certain relevant facts appear in the referee's report:

"On December 31, 1904, the company executed a mortgage covering the said real estate to R. A. Walker, as trustee, to secure the payment of a bond issue amounting to the sum of $12,500. This mortgage was duly recorded in the recorder's office of Chester county in Mortgage Book N 5, vol. 119, p. 368, and bonds to the amount indicated were issued, and the mortgage remains unsatisfied of record.

"Of these bonds the following are outstanding in the hands of their owners, and are unpaid:

| | |
|---|---|
| Ellen L. Thomas, Anna B. Thomas, and Pauline L. Thomas | $1,900 |
| Kate Smith | 1,200 |
| Knights of Golden Eagle, Lodge No. 232 | 1,000 |
| Roland Flaherty | 600 |
| Eri H. Poley | 1,000 |
| Isaac Wood, trustee | 700 |
| C. P. Swisher | 500 |
| | $6,900 |

"Some time prior to April 1, 1907, the corporation, desiring to increase its plant, decided to and did on that date create a new mortgage to secure a bond issue of $25,000, naming the Kennett Trust Company as trustee.

"This mortgage covers the same real estate as the first mortgage and remains of record in the recorder's office of Chester county in Mortgage Book K 6, vol. 134, p. 144, and remains unsatisfied. The secretary and treasurer of the Times Publishing Company, and the person in its active management at the time of the creation of both mortgages, was C. E. Morrison.

"In due course in the proceedings in bankruptcy, Francis G. Andrews was elected trustee, and upon taking possession of the books, papers, and assets of the company he found in a private box owned and kept by the said C. E. Morrison in the National Bank of Oxford a bundle of bonds, which had been issued by the company under the mortgage for $12,500 above referred to, amounting to the sum of $5,600. With these bonds was a paper in the handwriting of C. E. Morrison in the following language:

" 'These bonds are part of first issue, and the holders exchanged them for a like amount in the new issue. They are not an indebtedness against the company. C. E. Morrison.'

"With these bonds and the paper just quoted was a paper of which the following is a copy:

" 'We the undersigned bondholders of the Times Publishing Company under the issue in existence March 1, 1907, do hereby agree to exchange our present holdings for a like amount in a new issue for twenty-five thousand dollars to be secured in the same manner and conditions as our present bonds.

| | |
|---|---|
| Eri H. Poley. | C. P. Morris. |
| " 'Jeanette S. McCullough. | Chas. Swisher. |
| " 'Rebecca J. Runner. | S. E. Nivin: |
| " 'R. H. Ferguson. | Stewart Badgett. |

" 'W. Anderson.'

"In order to raise additional funds for the business purposes of the company, it doubtless was Morrison's plan to secure the surrender by the holders of the bonds then outstanding under the first mortgage, and with this in view he secured possession of the bonds found in his private box under the agreement above quoted, and probably under an additional verbal stipulation that before the plan would be carried to completion there would be a surrender of all the bonds.

"With this understanding the holders whose names appear above, except Chas. Swisher, surrendered their bonds amounting to $5,100, and received bonds in exchange therefor of like amount secured by the second mortgage."

Further facts are stated in the course of this opinion. After the second mortgage was executed and recorded, the following persons

became the owners and are now the holders for value of the new issue, either as purchasers for cash or as pledgees for money loaned:

| | | | |
|---|---|---|---|
| Eri H. Poley | $ 500 | L. Mary Frame | $ 300 |
| J. H. Yarnall | 300 | P. F. Hamilton | 500 |
| National Bank of Oxford | 1,000 | Farmers' Nat. Bank of Oxford | 1,000 |
| Christiana Nat. Bank | 1,500 | H. R. Montgomery | 2,100 |
| W. F. Beyer | 2,000 | H. W. Chalfant | 500 |
| Abram Ferguson | 600 | Mahlon Ironsides | 400 |
| Anna J. Ferguson | 100 | Sarah Jackson | 500 |
| Jacob Shook | 1,000 | Eva Bowden | 1,000 |

The signers of the foregoing agreement will be called the "assenting bondholders." They held $5,600 of the first issue, and if they have lost their rights under that mortgage the fund for distribution is large enough to pay in full the nonassenting bonds, and leave a balance to be apportioned among all the bonds (including those now in the hands of the assenting bondholders) that were issued under the second mortgage. But if all the bonds under the first mortgage, both assenting and nonassenting, are entitled to priority, the whole fund will be thus absorbed, leaving nothing for bonds under the second mortgage. The vital question therefore is whether the assenting bondholders must claim under the second mortgage only, or whether they are still entitled to insist upon their legal rights under the first mortgage. The referee decided that they had lost these rights, basing his ruling upon the following ground:

"The rule is a familiar one that' he who puts it in the power of another to commit a fraud must bear the consequence; when one of two parties who are equally innocent of actual fraud must lose, the one who by misplaced confidence in an agent or attorney has been the cause of the loss shall not throw it on the other. Xander v. Commonwealth, 102 Pa. 439."

The rule is undoubted, and if the facts require its application the assenting bondholders must bear the loss, which in that event would be due to misplaced confidence in a faithless agent. But in my opinion the evidence does not establish a case in which the rule should be applied, as I think can be made clear in a short discussion.

A word may be said at the outset concerning Morrison's memorandum found with the assenting bonds. It is plainly a self-serving declaration and should be disregarded. He could not draw his own conclusions about the legal effect of the transaction, and bind the assenting bondholders by an ex parte statement. Unquestionably these bondholders gave Morrison the power to make misleading statements to intending buyers of the second mortgage bonds, but (laying aside for the moment one instance of which I shall speak hereafter) it is not proved that any one was actually deceived. He may perhaps have deceived some buyers. There is room to suspect such conduct; but the witnesses do not establish the fact. It should not be overlooked that the first mortgage has not been satisfied either in whole or in part. The official record has always been constructive notice that the full amount of this mortgage was still a first lien on the property. In spite of such notice, however, it may be true that if Morrison had represented to intending buyers of the second mortgage bonds that the assenting bondholders (without regard to what

the nonassenting bondholders might do) had agreed to exchange their prior securities for second mortgage bonds; and if these buyers had bought in reliance upon his statements, the assenting bondholders might be estopped to deny the accuracy of these representations. I do not so decide—for other questions might then need decision, e. g., the extent of Morrison's agency, and his power to bind his principals by statements which they had not authorized—but for the purpose in hand the concession may be made. It is clear that the situation differs essentially from certain cases that have been cited, where one who has signed an agreement to subscribe for stock seeks to set up an undisclosed arrangement that modifies his apparent contract. There, in favor of other subscribers who have acquired rights with knowledge of his apparent contract and in reliance thereon, he is not allowed to repudiate or modify it to their loss. Here, however, so far as appears, the written agreement of the assenting bondholders was not exhibited to intending buyers of the second mortgage bonds, nor was its tenor accurately stated. At the best the testimony only shows that Morrison probably made some general declarations on the subject, but he did not exhibit the agreement or state its contents correctly. This will appear by a brief reference to what the witnesses said on this subject. Seven of the sixteen buyers or pledgees of the second mortgage bonds were examined:

E. H. Poley testified that he did not know that $5,600 had been exchanged; he never asked, but was told by Morrison that all of the first issue must be exchanged. Mahlon Ironsides said nothing about the assenting bonds; he supposed his purchase was all right, that his bond was a first mortgage, one of the first issue. H. R. Montgomery merely supposed that his bonds were secured by a first mortgage; he relied on the face of the bonds themselves. (They all contain a statement that they are first mortgage bonds.) Abram Ferguson did not buy his bond from Morrison at all, and relied on the face of the bond. The president of the Farmers' National Bank testified that Morrison told him that all the exchanges had not been made, but that they would be made; he had no definite knowledge on the subject except that two bonds had been exchanged, one for $500 and one for $1,000. Sarah Jackson's husband testified that Morrison said the first bonds were all retired, but he has nothing to say about the agreement of the assenting bondholders. Leaving the testimony of the seventh witness, W. F. Beyer, for consideration presently, it is clear I think that the legal rights of the assenting bondholders—which have always been supported by the unchanged record of the first mortgage—cannot be affected by such slight testimony as this. They were no doubt imprudent in putting their bonds into Morrison's own hands instead of depositing them in escrow with a third person. Evidently he might have done them serious injury, but the testimony does not prove that he actually did the harm which he may perhaps have intended. Surely the second mortgage bondholders cannot successfully claim to have been deceived by an agreement of which (so far as appears) they had no knowledge—especially in the face of the record notice which appeared to show that no such

agreement had ever been made. If a man has known nothing about the acts or declarations by which he nevertheless asserts that another person is estopped, it is elementary that the estoppel does not exist.

Moreover, suppose that Morrison had shown the agreement and the assenting bonds to intending buyers of the second mortgage bonds. The decision of the referee impliedly, but as I think inaccurately, assumes that these buyers had knowledge of the agreement. But, even if this were true, I do not think his conclusion would follow. What does the agreement say? Only that the signers will exchange their prior holdings for a like amount in the new issue "in the same manner and conditions as our present bonds." Clearly one of the "conditions" was that the new issue should also be a first mortgage, and it could not be a first mortgage until all the old bonds had been surrendered for exchange. At the best, therefore, intending buyers could only have been truthfully informed that some of the bonds were already in Morrison's hands to be exchanged for similar securities, namely, first mortgage bonds, whenever the mortgage for $25,000 should be qualified to take that position; and the record showed definitely that this time had not yet come. Even in the most favorable aspect of the testimony I am unable to find the necessary elements of estoppel; and of course, if, as the second mortgage bondholders themselves say, they knew nothing about the agreement, it could have had no effect upon their conduct.

It remains to consider the bonds of W. F. Beyer. This is his testimony in full:

"Q. You reside in the city of Lancaster?

"A. Yes, sir.

"Q. You are the owner of bonds to the amount of $2,000 issued by the Times Publishing Company on April 1, 1907. From whom did you purchase them?

"A. They were handed to me by C. E. Morrison. I came down here to look over his books, and he told me of the steady increase of the business he was doing; that there was a first mortgage of $12,500 on the property, and they needed more money for working capital and to redeem the old bonds. He said they would exchange the first mortgage bonds for the second ones. He then took out of his desk that paper that has been produced this morning, 'Exhibit 2,' signed by several holders of the first mortgage bonds, and said that he had the promise of the others to surrender, and on the strength of that I bought $2,000 and paid him cash for it, and at the same time I bought $1,000 worth of stock and paid a thousand dollars in cash for that."

This goes further than the testimony of any other witness, for Mr. Beyer saw the agreement, but in my opinion it still falls short of establishing an estoppel. The agreement itself was notice to him that the signers would only exchange for new first mortgage bonds, and the record was notice that a new first mortgage was not yet in existence, and could not occupy that position until all the bondholders under the mortgage for $12,500 should surrender their bonds. Mr. Beyer was evidently content to rely upon Morrison's promise that such surrender would be made, but so far as appears Morrison had no authority whatever to make any promise for the nonassenting bondholders, and the assenting bondholders coupled their promise to exchange with a condition (which Beyer knew) that was never carried out.

In a word, nearly everybody concerned in this transaction seems to have relied upon Morrison's statements without taking the trouble to verify them, and they relied on his word in the face of the official record and of the plain language of the written agreement. In my opinion the assenting bondholders have not lost their legal rights under the first mortgage.

The order of the referee is reversed, and he is directed to permit these bondholders to prove their claims under the mortgage of $12,500, and in the distribution of the fund to allow priority to all the claimants under that mortgage.